| | |
|---|---|
| JOSEPH KNORR,<br><br>    Plaintiff,<br><br>v.<br><br>GARY LYNCH, G.J.L. FARMS, LLC, GJL REAL ESTATE, LLC, AND PROTEIN SOURCES, LLP<br><br>    Defendants. | Case No. _____<br><br>**VERIFIED COMPLAINT AND REQUEST FOR EQUITABLE RELIEF** |

Plaintiff, Joe Knorr, brings this action at law and in equity against Defendants, Gary Lynch, GJL Real Estate LLC ("GJL Real Estate"), G.J.L. Farms, LLC ("GJL Farms"), and Protein Sources, LLP ("Protein Sources"). Mr. Knorr alleges, on information and belief, except for information based on personal knowledge, as follows:

## PARTIES

1.  Joe Knorr is an individual who resides in Savannah, Missouri. He is a resident of Missouri. Mr. Knorr is a life-long farmer.

2.  Gary Lynch is an individual who resides in Waucoma, Iowa. He is a resident of Iowa. Upon information and belief, his net worth is more than $1 billion.

3.  G.J.L. Farms, LLC is a limited liability company, organized under the laws of the State of Iowa, with its principal office located in Waucoma, Iowa.

4.  GJL Real Estate, LLC is a limited liability company, organized under the laws of the State of Iowa, with its principal office located in Waucoma, Iowa.

5.  Upon information and belief, Gary Lynch, a resident of Iowa, is the sole member of GJL Farms and GJL Real Estate.

6. Mr. Lynch owns and controls GJL Farms, GJL Real Estate, and several other companies that engage in agricultural-related businesses.

7. Protein Sources is a limited liability partnership organized under the laws of the State of Minnesota, with its principal offices located in Mapleton, Minnesota.

8. According to its website, "Protein Sources provides production and financial management services for farrowing and grow-finish swine operations in the upper Midwest, principally Minnesota and Iowa. We tailor our services to each client's particular needs, from complete farm management to unbundled consulting services including swine production, financial management, facility and site management, swine herd health services, risk management (lean hogs and feed inputs) and animal radio frequency identification (RFID) & traceability." https://www.proteinsourcesmanagement.com/#

9. According to its website, "Protein Sources has extensive swine production experience. Many pork production management companies have individuals in charge who possess little on-farm swine production experience or lack specific experience with the large, complex swine operations prevalent today. The fact that our partners and managers have been actively involved in swine production throughout their lives has been a key success factor for Protein Sources and more importantly, for our clients." https://www.proteinsourcesmanagement.com/#.

10. According to is website, "[a]nother key success factor for Protein Sources is its focus on accurate, timely and meaningful financial information, utilizing generally accepted accounting principles (GAAP) basis and historical cost financial statements. Many veterinary clinics and other management firms typically manage pork production systems utilizing so-called "production" information systems with substantially less emphasis on the financial aspects

affecting key business decisions. We not only provide financial statements in accordance with GAAP, but we also provide recommendations for capital budgeting decisions, financing/company capitalization structure, detailed financial analyses of operations and recommendations for profit improvement, including more effective use of human resources assets. Protein Sources partners, employees and client employees undergo valuable, continued training and education opportunities to not only better their own careers, but to improve the companies they serve." https://www.proteinsourcesmanagement.com/#.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this Action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.

12. Venue is appropriate pursuant to 28 U.S.C. § 139(b)(2), because a substantial part of the events or omissions giving rise to the claims at issue occurred within this judicial district.

## FACTUAL BACKGROUND

13. This Action concerns an orchestrated plot, plan and conspiracy by Defendants to operate a business in a manner that improperly "squeezes out" Mr. Knorr, a minority member, and further deprive him of dividends and additional equity he otherwise would have received.

14. A "CAFO" is a concentrated animal feeding operation. They are large operations where large numbers of swine, cattle, or chicken can be housed for purposes of producing them (*e.g.*, feeding and caring for them to grow and add meat), so they can then be sold for processing.

15. Mr. Knorr is a farmer, who has long-dreamt of building and operating a hog CAFO in his home town. However, Mr. Knorr personally lacked the finances necessary to build the state-of-the-art facility that he envisioned.

16. In 2015, Mr. Knorr was introduced to Mr. Lynch. Mr. Lynch operates CAFOs and similar operations in Iowa and Minnesota. Mr. Lynch also owns at least six independent meat-packing facilities. As such, upon information and believe, he is one of the country's largest independent meat packers. Mr. Lynch offered to provide the financing that would be necessary to allow Mr. Knorr to pursue his dream.

17. Unfortunately, even from the beginning of the relationship between Mr. Knorr and Mr. Lynch, Mr. Lynch did not intend to operate their business venture in a way that would benefit them collectively as members, but rather intended to structure the arrangement to "squeeze out" and otherwise harm his minority partner, Mr. Knorr.

18. Stone Ridge Pork, LLC ("Stone Ridge Pork") was formed in February 2016 for purposes of operating Mr. Lynch's and Mr. Knorr's hog CAFO in Savannah, Missouri. The purpose and goal of Stone Ridge Pork was to receive baby swine following gestation, produce them into high-quality adult hogs (for purposes of eventual use by Chipotle, Whole Foods and other companies that have established higher standards for their meat), and then sell the hogs for processing to GJL Farms.

19. Mr. Knorr was excited about the relationship because he believed that he had not only found a party that could obtain necessary financing to complete the facility, but also a dedicated third-party to which the business could sell its hogs.

20. On March 18, 2016, GJL Real Estate, an entity owned and controlled by Mr. Lynch, and Mr. Knorr entered into an Operating Agreement for Stone Ridge Pork (the "Operating Agreement"). A true and accurate copy of the Operating Agreement is attached as Exhibit 1.

21. Pursuant to the Operating Agreement, GJL Real Estate was required to contribute $2,100,000 in capital, in exchange for 700 units in Stone Ridge Pork, and Mr. Knorr, who had

begun construction of the facility from Stone Ridge Pork would operate, was required to contribute the real property where the facility would be operate along with the construction permit he had obtained for the facility, in exchange for 300 units.

22.     On May 5, 2016, Gary Lynch executed an Action by Consent of the Members of Stone Ridge Pork, LLC, by and through which he transferred all of GJL Real Estate's membership interest in Stone Ridge Pork to GJL. A true and accurate copy of that document is attached as <u>Exhibit 2</u>. GJL Farms has been the controlling Member of Stone Ridge Pork at all times since May 5, 2016.

23.     While Mr. Knorr dutifully contributed his land, upon information and belief, GJL Real Estate never contributed its $2.1 million. Instead, upon information and belief, GJL Farms loaned funds to Stone Ridge Pork. As a result, rather than standing as an equal, equity member in Stone Ridge Pork with Mr. Knorr, Mr. Lynch's Stone Ridge Pork instead is a creditor who stands to receive Stone Ridge Pork's assets if the company fails.

24.     Gary Lynch, as Manager, has failed to take any actions to collect such funds. To the contrary, GJL Real Estate's failure to make such contribution has been intentional and caused by Mr. Lynch, who owns and controls GJL

25.     The Operating Agreement provides that Gary Lynch would serve as the Manager of Stone Ridge Pork. He has served as the Manager of Stone Ridge Pork at all times since the Operating Agreement was signed.

26.     As Manager of Stone Ridge Pork, Mr. Lynch is, and has at all times, been entrusted and required to, "exclusively direct the Company's business and affairs. To the maximum extent permitted by the Act or this Agreement, the Manager shall have the right to take such actions, or delegate to the Officers or other Persons the right and power to take the such actions, as may be

- 5 -

Case 5:20-cv-06114-DGK   Document 1   Filed 08/13/20   Page 5 of 19
CORE/3519026.0002/160729285.2

necessary or convenient for, or incidental to, the Company's purposes, including without limitation," generally all of the functions necessary to operate and finance Stone Ridge Pork. (Op. Ag. 8.4(a)-(o).

27. Thus, in his capacity as Manager, Mr. Lynch has served as the person principally responsible for the Company's operations and ensuring that the Company fulfilled its operations in compliance with the terms of the Operating Agreement and all applicable laws.

28. In his capacity as Manager of Stone Ridge Pork, Mr. Lynch owes fiduciary duties of care and loyalty to Stone Ridge Pork and its members, including Joe Knorr.

29. Shortly after the Operating Agreement was signed and Stone Ridge Pork began operations, Mr. Lynch retained Protein Sources to serve as his retained management company, and to be responsible for the day-to-day management of Stone Ridge Pork. Stone Ridge Pork has served in that capacity at all time since Stone Ridge Pork began operations.

30. Upon information and belief, Protein Sources has served in that capacity on a "hand shake" agreement basis between its representative and Mr. Lynch.

31. Upon information and belief Protein Sources is loyal and financially incentivized to follow the directions and wishes of Mr. Lynch, even if such directions are not for the benefit of Stone Ridge Pork and/or Joe Knorr.

32. Upon Information and belief, Protein Sources serves as the management company for several other facilities that are owned and controlled by Mr. Lynch and/or his affiliated companies. Protein Sources does not want to lose those accounts or otherwise damage its lucrative relationship with Mr. Lynch.

33. In its capacity as Mr. Lynch's chosen management company, Protein Sources owes fiduciary duties to Stone Ridge Pork and its members to carry out its duties with care and loyalty.

34. The Operating Agreement provides that, "the Company shall maintain and preserve at its principal office relevant Company documents including, but not limited to (a) a current list of the full name and last known business address of each Member, (b) a copy of the Certificate of Organization and all amendments thereto, (c) copies of the Company's federal, state and local income tax returns and reports, if any, for the three (3) most recent years, (d) copies of any financial statements for the three (3) most recent years; and (e) a copy of the Operating Agreement. Upon reasonable request, each Member shall have the right, during ordinary business hour."

35. Mr. Knorr has requested that Defendants allow him access to the business records identified in the previous paragraph. Defendants have denied Mr. Knorr from access to the information.

36. According to the Operating Agreement, Stone Ridge Pork is required to have an annual meeting. (Op. Ag. 6.1). Notice of such meeting was required to be given to Mr. Knorr not less than ten (10) days and not more than fifty (50) days before the date of the meeting in writing. (*Id.* at 6.6). Since Stone Ridge Pork's, formation, however, Mr. Lynch has failed and refused to convene any annual meetings and has failed to give notice of any meetings to Mr. Knorr.

37. In 2016, Stone Ridge Pork, LLC completed its state-of-the-art CAFO in Savannah, Missouri and began operations.

38. Stone Ridge Pork and GJL Farms entered into a Farrower/Finisher Production Agreement. A true and accurate copy of which is attached as Exhibit 3. Pursuant to that agreement, GJL Farms would purchase all of the hogs that Stone Ridge Pork produced. Pursuant to the agreement, Stone Ridge Farms, "shall deliver no less [than] 2,250 head and not more than 2,750 head of weaned pigs to Contractor each calendar week during the Term of this agreement."

(Ex. 3 at ¶3). The contract also established the prices that GJL Farms would pay to Stone Ridge Pork for its pigs.

39. To produce the quantity of hogs identified in the preceding paragraph, Stone Ridge Pork would need to operate at near its capacity of approximately 5,600 head of hogs.

40. It was the intent, plan and agreement of Mr. Knorr and Mr. Lynch at the time they signed the Operating Agreement that the facility would be operated at or near capacity.

41. Since its inception, Gary Lynch has directed Protein Sources to intentionally operate the facility at diminished capacity and to take other steps to intentionally operate Stone Ridge Pork at a Loss. In fact, Mr. Lynch specifically told and directed Protein Sources to do so, and it has dutifully followed Mr. Lynch's directives. Meanwhile, because GJL Farms lent money to Stone Ridge Pork, rather than contributed equity, it stands to take the company after Defendants intentionally run it into insolvency.

42. A "squeeze-out" is an effort by a majority member to intentionally take steps to dilute his minority partner out of ownership and/or force the minority to sell their stake at an improperly diminished price.

43. Mr. Lynch's and Protein Source's intentional and conspired plan is generally known as a "squeeze out." By intentionally operating Stone Ridge Pork at a loss, Mr. Lynch intends to intentionally require Joe Knorr to make capital contributions that Mr. Lynch knows Mr. Knorr does not have. Protein Sources has intentionally operated the company at a loss to further and advance that goal and purpose.

44. This dilution has been caused, at least in part, by a capital call that Mr. Lynch caused Stone Ridge to place on account of its improper losses. Mr. Knorr was unable to contribute the $400,000 that he was called to do provide. Meanwhile, however, Mr. Lynch failed to

contribute the corresponding portion that GJL was supposed to provide, but rather lent such money to Stone Ridge Pork. Therefore, Mr. Knorr's ownership decreased improperly, while Stone Ridge Pork did not even receive funds from GJL.

45. Mr. Knorr has continually been diluted, with Mr. Lynch owning an additional stake and possessing purported debt if the company fails.

46. Since Stone Ridge's inception, because Defendants have intentionally caused the company to operate at a loss, Mr. Knorr's ownership interest has been diluted from 30% (300 of 1,000 total units) to, upon information and belief, approximately 7%.

47. In addition, if Stone Ridge Pork was being operated at full capacity and otherwise with the intent of being profitable, Mr. Knorr would have received annual dividends from Stone Ridge Pork and/or enhanced equity in the company.

48. Specifically, at Mr. Lynch's direction, Protein Sources has operated the facility at approximately 3,000 heads of swine, rather than its approximately 5,600 capacity. As a result, upon information, Stone Ridge Pork has had millions of dollars of operating losses since its inception.

49. The exact amount of such losses is unclear, because Defendants have intentionally and improperly: (i) refused to allow Mr. Knorr access to the facility for purposes of inspecting Stone Ridge Pork's records; (ii) refused to call or hold annual meetings; (iii) refused and failed to provide Mr. Knorr with annual financial statements or other materials; and (iv) otherwise improperly interfered with Mr. Knorr's rights to information as a member.

50. Since inception, Protein Sources has also failed to properly treat sick hogs, and has done so at the ultimate direction and instruction of Gary Lynch. This has further caused Stone Ridge Pork to improperly lose additional amounts.

51. Mr. Lynch, by and through GJL Farms has purchased the hogs that Stone Ridge Pork has produced since its inception. Since its inception, Mr. Lynch has not paid the appropriate rates for those hogs, but rather has paid decreased amounts, thereby further resulting in Stone Ridge Pork losing additional amounts.

52. Mr. Lynch has taken other steps to operate Stone Ridge Pork for his personal benefit, and to the detriment of Mr. Knorr. Mr. Lynch has caused Stone Ridge Pork to accelerate depreciation on assets (further contributing to Stone Ridge Pork's losses), and he has done this, so that losses would be passed through to him, which losses he has offset against his other, profitable businesses.

53. Mr. Lynch has also caused Stone Ridge Pork to pay excessive amounts to Protein Sources for projects that it has completed, which amounts have been, at least in some instances, several multiples above what others had quoted. Upon information and belief, such payments have been made to reward and compensate Protein Sources for its role in squeezing Joe Knorr out of Stone Ridge Pork.

54. Mr. Knorr has requested that Protein Sources provide the financial and other information that he is entitled to receive pursuant to the Operating Agreement. In response, in 2019, Protein Sources told Mr. Knorr that they, "have been told that moving forward any requests for information regarding Stone Ridge should be requested through the managing partner (Lynch) at this time."

## COUNT I
## BREACH OF FIDUCIARY AND RELATED DUTIES

55. Mr. Knorr incorporates herein by reference the allegations contained in paragraphs 1 through 54 and the exhibits attached hereto as though set forth in their entirety.

56. Gary Lynch, in his capacity as the Manager of Stone Ridge Pork, owes fiduciary duties of care and loyalty to Stone Ridge Pork and its members. Those duties included operating the company in a manner that was aimed to benefit the Company and all of its Members, and to not operate the Company in a manner that was aimed to benefit him personally, at the expense of Mr. Knorr.

57. Protein Sources, as Mr. Lynch's retained management company likewise owes fiduciary duties of loyalty to Stone Ridge Pork and its members. Those duties included operating the company in a manner that was aimed to benefit the Company and all of its Members, and to not operate the Company in a manner that was aimed to benefit him personally, at the expense of Mr. Knorr.

58. Defendants breached the fiduciary duties of loyalty and care that they owed Stone Ridge Pork and Mr. Knorr, as a member, by intentionally operating Stone Ridge Pork at a loss for purposes of diminishing Mr. Knorr's financial interest and ultimately forcing him to choose between: (i) being diluted out of any ownership interest and/or (ii) selling his membership interests to GJL for an unreasonably low amount.

59. Alternatively, Defendants have operated Stone Ridge Pork in a reckless and dilatory manner that violates their duty of care to the company, likewise harming the company and its members.

60. Mr. Knorr has been uniquely injured by Defendants' conduct relative to other member(s). In fact, his injury has been unique and different by design and as a direct result of Defendants' coordinated efforts.

CORE/3519026.0002/160729285.2

## COUNT II
## AIDING AND ABETTING AND CONSPIRACY TO BREACH FIDUCIARY AND RELATED DUTIES

61. Mr. Knorr incorporates herein by reference the allegations contained in paragraphs 1 through 60 and the exhibits attached hereto as though set forth in their entirety.

62. Mr. Lynch directed Protein Sources to operate the facility at diminished capacity for purposes of squeezing Mr. Knorr out. Knowing this improper goal, Protein Sources then agreed to, and has, followed Mr. Lynch's directives.

63. Protein Sources has done so, because it generates significant revenues from Mr. Lynch and the other businesses that he owns or is otherwise affiliated with, and it does not wish to lose that revenue and the expectations of future revenues.

64. In addition to violating the fiduciary duties that it owes to Stone Ridge Pork by intentionally operating the company at diminished capacity and otherwise for purposes of intentionally losing money, Protein Sources has knowingly and intentionally aided and abetted and conspired with Mr. Lynch to breach the fiduciary and other duties that he owes to Stone Ridge Pork and its members.

65. Mr. Knorr has been uniquely injured by Defendants' conduct relative to other member(s). In fact, his injury has been unique and different by design and as a direct result of Defendants' coordinated efforts.

## COUNT III
## FRAUD

66. Mr. Knorr incorporates herein by reference the allegations contained in paragraphs 1 through 65 and the exhibits attached hereto as though set forth in their entirety.

67. Mr. Knorr met with Gary Lynch in 2015.

CORE/3519026.0002/160729285.2

68. During that meeting, Mr. Lynch and Mr. Knorr discussed becoming business partners and the success that they could have by combining Mr. Lynch's financial resources with Mr. Knorr's existing facility, permit and passion.

69. During that meeting Mr. Lynch represented that he and his associates would cooperate and work with Mr. Knorr to make their business venture a success, and did so with the specific intent of convincing Mr. Knorr to enter into an operating agreement.

70. Mr. Knorr reasonably relied upon Mr. Lynch's representations and proceeded to sign the Operating Agreement.

71. Unbeknownst to Mr. Knorr, Mr. Lynch did not intend to operate their business venture in a profitable or otherwise proper manner, but rather intended to intentionally lose money in order to squeeze Mr. Knorr out.

72. Mr. Lynch's statements to the contrary were intentional misrepresentations, and he has intentionally caused Stone Ridge Pork to lose money to Mr. Knorr's ultimate detriment.

73. Mr. Knorr has been damaged by Mr. Lynch's fraudulent statements and inducement.

## COUNT IV
## BREACH OF CONTRACT

74. Mr. Knorr incorporates herein by reference the allegations contained in paragraphs 1 through 73 and the exhibits attached hereto as though set forth in their entirety.

75. GJL signed the operating agreement and agreed to abide by its terms.

76. The Operating Agreement is a valid and enforceable contract.

77. Joe Knorr signed the Operating Agreement and has substantially complied with all of its terms.

CORE/3519026.0002/160729285.2

78. Both GJL and Joe Knorr provided consideration in exchange for signing the Operating Agreement.

79. GJL has breached the Operating Agreement in several ways, including, but not limited to, its failure to make its requisite initial contribution of $2,100,000.

80. Joe Knorr and Stone Ridge Pork have been damaged as a result of GJL's breach of the operating agreement.

81. Since 2017, Protein Sources has served as the management company for Stone Ridge Pork.

82. Protein Sources has done so upon a hand-shake agreement with Gary Lynch.

83. Protein Sources has been dutifully paid for its services as serving as the management company for Stone Ridge Pork.

84. Protein Sources has breached its agreement with Stone Ridge Pork by failing to act in a manner that is consistent with generally accepted standards and practices, including intentionally operating the facility at diminished capacity so that it loses money.

85. Stone Ridge Pork and Joe Knorr have been damaged as a result of Protein Sources breach of its agreement with Stone Ridge Pork.

86. This count is brought by Joe Knorr both in his individual capacity and also on behalf of Stone Ridge Pork.

87. Upon information and belief, it would be futile for Mr. Knorr to ask Mr. Lynch to cause Stone Ridge Pork to bring suit against GJL and/or Protein Sources to recover for the deliberate, improper actions they have undertaken.

CORE/3519026.0002/160729285.2

## COUNT V
## PROFESSIONAL NEGLIGENCE

88. Mr. Knorr incorporates herein by reference the allegations contained in paragraphs 1 through 87 and the exhibits attached hereto as though set forth in their entirety.

89. Protein Sources has a duty to discharge its duties to Stone Ridge Pork in a manner that is consistent with the generally accepted standards that are adopted by similar professionals.

90. To the extent that Protein Sources has not intentionally operated Stone Ridge Pork at diminished capacity to intentionally lose money (and undertaken other steps at Mr. Lynch's direction to intentionally operate the business in an unprofitable manner), then it has managed and operated the facility in a manner that is not consistent with generally accepted standards of like professionals.

91. Stone Ridge Pork and its members have been harmed as a result.

## COUNT VI
## PUNITIVE DAMAGES

92. Mr. Knorr incorporates herein by reference the allegations contained in paragraphs 1 through 91 and the exhibits attached hereto as though set forth in their entirety.

93. The conduct of each of the Defendants was committed in willful and wanton disregard for the rights of Mr. Knorr. The conduct of the Defendants was directed specifically at Mr. Knorr. Mr. Knorr is entitled to punitive damages for Defendants' conduct.

## COUNT VII
## REQUEST FOR AN ACCOUNTING

94. Mr. Knorr incorporates herein by reference the allegations contained in paragraphs 1 through 93 and the exhibits attached hereto as though set forth in their entirety.

95. Joe Knorr is a member of Stone Ridge Pork.

CORE/3519026.0002/160729285.2

96. As a member of Stone Ridge Pork, Joe Knorr is entitled to receive financial information and records on a timely basis, and he is entitled to access the Stone Ridge Pork's offices for purposes of doing so.

97. Mr. Knorr's rights stem from both the Operating Agreement and also Iowa law.

98. Upon information and belief, in order to conceal their ongoing malfeasance, Defendants have failed to provide Mr. Knorr with the financial information and records that he is entitled to receive.

99. Mr. Knorr is entitled to receive the financial records specified in the Operating Agreement and an order allowing him and his retained professionals access to Stone Ridge Pork for purposes of doing so.

100. An accounting is necessary and appropriate, given Defendants failure to provide required information and simultaneous steps to underfund Stone Ridge Pork, improperly deprive Mr. Knorr of dividends, and improperly dilute him out of the company.

## JURY DEMAND

101. Mr. Knorr demands a trial by jury for all matters for which a jury trial is available at law or otherwise.

## REQUESTED RELIEF

WHEREFORE, Joe Knorr respectfully pray that judgment be entered against Defendants and the following relief be entered against Defendants in favor of Mr. Knorr:

A. Equitable relief requiring Defendants to make Stone Ridge Pork's books and records available for an accounting by Mr. Knorr and/or his designated professionals, including, but not limited to, those records specified in Section 5.3 of the Operating Agreement;

B.	All monetary damages available, including all direct, indirect, general, special and other damages available at law or otherwise in an amount to be determined after an accounting, but believed to be in excess of $1 million.

C.	Attorneys' fees and other costs incurred to investigate and pursue this action;

D.	Punitive and exemplary damages;

E.	Immediate and permanent injunctive relief requiring Defendants to operate Stone Ridge Pork in a manner consistent with the terms of the Operating Agreement and consistent with their obligations as fiduciaries to the company;

F.	Prejudgment interest; and

G.	Such other and further legal or equitable relief that may be available and appropriate.

Dated this 13th day of August, 2020.    Respectfully Submitted,

STINSON LLP

By: */s/ Samuel L. Blatnick*
    Samuel L. Blatnick, MO #67598
    Matthew Moderson, MO #64035
    STINSON LLP
    1201 Walnut Street, Suite 2900
    Kansas City, MO 64106
    Telephone: (816) 691-2712
    E-mail: samuel.blatnick@stinson.com
    E-mail: matt.moderson@stinson.com
    **ATTORNEYS FOR PLAINTIFFS**

## VERIFICATION

I, on behalf of myself, I certify under penalty of perjury and pursuant to the laws of the State of Missouri that the preceding is true and correct to the best of my knowledge and belief.

Date: August 13, 2020

_____
Joseph Knorr